# FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

B-16-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 03:17CR 137 (SRU) |
| | : | |
| v. | : | |
| | : | VIOLATIONS: |
| KAMRAN KHAN, | : | 18 U.S.C. § 371 (Conspiracy) |
| MUHAMMED ISMAIL, | : | |
| aka "Muhammad Ismail," | : | 50 U.S.C. §§ 1702 and 1705 |
| KAUSER ENTERPRISES, USA, | : | (Export Without a License) |
| KAUSER ENTERPRISES, | : | |
| BRUSH LOCKER TOOLS DIVISION, and | : | 18 U.S.C. § 2 (Aiding and Abetting) |
| NORTH HAVEN TOOLS, | : | |
| | : | 18 U.S.C. § 1956(h) |
| Defendants. | : | (Conspiracy to Commit Money Laundering) |
| | : | |
| | : | 18 U.S.C. § 1956(a)(2)(A) |
| | : | (Money Laundering) |
| | : | |
| | : | 18 U.S.C. § 1001 |
| | : | (False Statement) |

## INDICTMENT

The Grand Jury charges:

At all times relevant to this Indictment:

A. The International Emergency Economic Powers Act

1.      Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§§1701-1707, the President is granted the authority to deal with unusual and extraordinary

threats to the national security, foreign policy, and economy of the United States. Under IEEPA,

the President can declare a national emergency through executive orders that have the full force

and effect of law.

2. Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy and economy of the United States in light of the expiration of the Export Administration Act, 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. 66 Fed. Reg. 44,025 (Aug. 22, 2001). While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the Department of Commerce ("DOC")'s Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. *See* 15 C.F.R. § 730.2. In Executive Order 13222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the present. *See, e.g.*, 81 Fed. Reg. 52587 (Aug. 8, 2016).

3. Pursuant to its authority derived from IEEPA, the DOC reviews and controls the export of certain goods and technologies from the United States to foreign countries. In particular, the DOC has placed restrictions on the export of goods and technologies that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.

4. The EAR contain a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons – that are subject to specific license requirements for the export, re-export

and/or in-country transfer of specified items. These persons comprise the DOC's "Entity List," which is found at Title 15, Code of Federal Regulations, Part 744, Supplement No. 4. The DOC first published the Entity List in February 1997 as part of its efforts to inform the public of entities who have engaged in activities that could result in an increased risk of the diversion to weapons of mass destruction ("WMD") programs of items exported, re-exported, and transferred (in-country). Since its initial publication, grounds for inclusion on the Entity List have expanded to include activities sanctioned by the U.S. State Department and activities contrary to U.S. national security and/or foreign policy interests.

5.     On an individual basis, the persons on the Entity List are subject to export licensing requirements and policies supplemental to those found elsewhere in the EAR. On November 19, 1998, the DOC added the Pakistan Atomic Energy Commission ("PAEC"), the Space & Upper Atmosphere Research Commission ("SUPARCO"), and the National Institute of Lasers & Optronics ("NILOP") to the Entity List, for nuclear non-proliferation reasons, and each has remained on the list at all times relevant to this Indictment. Accordingly, at all times relevant to this Indictment, a license was required from the DOC for all exports to PAEC, SUPARCO, and NILOP of all items subject to the EAR. No license exception may be used to export, re-export, or transfer (in-country) to such entities unless specially authorized on the Export License.

6.     Under IEEPA and the EAR, it is a crime to willfully export, or attempt or conspire to export, from the United States, any item requiring an export license without first obtaining the license from the DOC. *See* 50 U.S.C. § 1705(c) and 15 C.F.R. § 764.2.

The United States Department of Commerce has certified that none of the defendants, or any of the co-conspirators, or any of the businesses listed in paragraph seven, below, ever applied for, or received a license from the BIS to export any item subject to the EAR from the United States.

B. <u>The Defendants, Co-Conspirators and Related Businesses</u>

7.     The Defendants, non-indicted co-conspirators and related businesses herein are:

    a.     Defendant KAMRAM KHAN was living in Pakistan and was doing business as Kauser Enterprises.

    b.     Defendant MUHAMMED ISMAIL aka "Muhammad Ismail" was living in Meriden, Connecticut and doing business as Kauser Enterprises.

    c.     Co-conspirator #1, who is known to the grand jury, was living in Pakistan.

    d.     Defendant Kauser Enterprises, USA ("Kauser-USA") was a domestic LLC registered on or about February 22, 2008, with a business and mailing address of ********, North Haven, CT 06473.

    e.     Defendant Brush Locker Tools Division, LLC ("Brush Locker"), was a domestic LLC registered on or about August 7, 2007, with a business and mailing address of 209 Shelton Avenue, New Haven, CT 06473.

    f.     Defendant North Haven Tools was a business registered in Connecticut, with an address of ********, North Haven, Connecticut.

    g.     Defendant Kauser Enterprises ("Kauser-Pakistan") is an exporter/importer of mechanical parts, machine tools & general goods and was located: LA6IB Block 22, F.8. (IND) Area, Karachi, Pakistan.

    h.     Imran Khan, who was charged separately, was doing business as Kauser Enterprises, USA; Brush Locker Tools Division, North Haven Tools and Cerda Market.

    i.     Cerda Market was a business that operated as a corner grocery store located at 209 Shelton Avenue, New Haven, CT 06473.

COUNT ONE<br>(Conspiracy to Export Without a License)

8.     Paragraphs 1 through 7 are hereby re-alleged as if fully set forth herein.

9.     From a date unknown, but not later than in or about August 2012, and continuing to on or about October 13, 2013, the defendants, KAMRAN KHAN, MUHAMMED ISMAIL,

BRUSH LOCKER TOOLS DIVISION, KAUSER ENTERPRISES – USA, KAUSER
ENTERPRISES and NORTH HAVEN TOOLS, in the District of Connecticut and elsewhere,
did, knowingly, willfully and unlawfully, combine, conspire, confederate and agree with each
other, and with other persons known and unknown to the grand jury, to commit an offense
against the United States, to wit, to export and cause the export of controlled goods from the
United States to organizations in Pakistan listed on the Entity List without a license or proper
authorization from the United States Department of Commerce, in violation of the IEEPA, Title
50, United States Code, Section 1702 and 1705(c).

I.     OBJECT OF THE CONSPIRACY

10.    The object of the conspiracy was to purchase controlled goods from
manufacturers in the United States and abroad, and export those goods without a license to
organizations in Pakistan that were listed on the DOC Entity List.

II.    MANNER AND MEANS OF THE CONSPIRACY

11.    Among the means and methods employed by the defendants to carry out the
conspiracy and effect its unlawful objects were those set forth below:

a.     Co-conspirator #1 would receive tenders, that is, a request for a product, in some
cases directly from agencies of the Pakistani Government and in other cases, Co-conspirator #1
attempted to fill tenders that were up for public bid from the Pakistani Government.

b.     Co-conspirator #1 would then send email communications to KAMRAN KHAN
(hereinafter "KHAN") and/or ISMAIL, requesting them to procure specific products that were
subject to the EAR.

c.     KHAN and/or ISMAIL would communicate the request to Imran.

d.     In some instances, ISMAIL contacted U.S. manufacturers directly.

e.     If asked about the end-user, Imran, and/or ISMAIL would informed the manufacturer that the product would remain in the United States or would falsely fill out an end-user certification indicating the product would not be exported.

f.     After items were successfully purchased, they were shipped by the manufacturer to Imran at either his residence in North Haven, CT 06473 or at Cerda Market, 209 Shelton Avenue, New Haven, CT, 06511.

g.     The items were then shipped to Co-conspirator #1 or to Kauser Enterprises-Pakistan on behalf of either the PAEC, SUPARCO or NILOP.

h.     The defendants made false and misleading statements on the export declaration forms and shipping documents concerning the value of the items and their true nature.

III.     OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

12.     In furtherance of this conspiracy, and to accomplish its goals and objectives, the following overt acts, among others, were committed in the District of Connecticut and elsewhere:

A. The August 2012 purchase of an Alpha Duo Spectrometer from Company #1

13.     On or about August 18, 2012, Co-conspirator #1, via email, sent KHAN a request for quotation ("RFQ") for several items, including an Alpha Duo Spectrometer. In the email message, Co-conspirator #1 warned: "Just don't ask these items for Pakistan. Also don't go all the Items at one time. Ask quotation partially. Act carfully (sic)."

14.     On or about August 19, 2012, KHAN forwarded the email from Co-conspirator #1, including the warning, to Imran.

15.     On or about August 22, 2012, Imran, via email sent an RFQ to Company #1, known to the grand jury, for an Alpha Duo Spectrometer.

6

16.     A spectrometer is a device used for recording and measuring spectra. An Alpha Duo Spectrometer is a benchtop spectrometer with two alpha spectroscopy channels. Spectrometers have both commercial and military applications.

17.     On or about August 23, 2012, Company #1 provided Imran with a form end-user statement.  The form stated, in pertinent part:

> As a supplier of commodities listed on the Commerce Control List (CCL), we are required by the U.S. Department of Commerce to comply with the Export Administration Regulations (EAR) to ensure complete compliance with the U.S. export controls.

18.     On or about August 27, 2012, Imran, as the Purchasing Manager for Brush Locker, returned the form to Company #1, identifying Brush Locker, 209 Shelton Avenue, New Haven, CT, as the end-user organization.

19.     On or about August 27, 2012, Company #1 provided Imran, via email, with a quote for one Alpha Duo Spectrometer, among other items, addressed to Kauser-USA at 209 Shelton Avenue in New Haven, Connecticut.

20.     On or about September 3, 2012, KHAN forwarded Company #1's quote to Co-conspirator #1 via email.

21.     Throughout September and October 2012, KHAN and Co-conspirator #1 exchanged several email messages concerning the transaction, including an email message on or about September 26, 2012, that contained a spreadsheet detailing the transaction and potential profits.

22.     On or about September 26, 2012, KHAN forwarded the information concerning costs and profits in the spreadsheet to ISMAIL via email.

23.     On or about October 4, 2012, Co-conspirator #1 instructed KHAN to proceed with the transaction, stating: "Ok go ahead and Best of Luck."

24.     On or about October 9, 2012, Company #1 provided Imran a final quote for the Alpha Duo Spectrometer and other items in the amount of $26,331.38. This final quote (#AK2675-4) was addressed to "Imran Khan, Brush Locker Tools Division, 209 Shelton Avenue, New Haven, CT 06511.

25.     On or about October 10, 2012, Imran provided Company #1 a shipping address of "Brush Locker Tools Division," 209 Shelton Avenue in New Haven, Connecticut (the location of Cerda Market).

26.     On or about November 7, 2012, KHAN sent an email to Co-conspirator #1, attaching an invoice from "Kauser Enterprises USA LLC, 128 Spectacle Pond Road, Littleton, MA 01460 Email: ******@yahoo.com to "Kauser Enterprises, LA 6/B Block 22, F.B (IND) Area, Karachi, Pakistan Email: ****@***.com in the amount of $35,549.658.

27.     On or about December 12, 2012, Co-conspirator #1 emailed KHAN indicating that $35,549.66 was being wired transfer to Kauser Enterprises USA LLC, 128 Spectacle Pond Road, Littleton, MA  01460.

28.     On or about December 12, 2012, the Alpha Duo Spectrometer and related items were shipped by Company #1 to 209 Shelton Avenue, New Haven, Connecticut (the location of Cerda Market).

29.     On or about December 12, 2012, a wire transfer in the amount of 35,549.66 was processed by Sanco, UAE to the order of Kauser Enterprises USA LLC at Account No. ending in 6327 at People's Bank, Hamden, CT.

30.     On or about December 18, 2012, Co-conspirator #1 instructed KHAN to send the "[spectrometer] shipment" to "NTS (Nano tech Solutions)" H. No. 269-B, Street No. 17, F-10/2, Islamabad, Pakistan.

31.     On or about December 31, 2012, KHAN forwarded the instructions to Imran.

32.     On or about January 4, 2013, Imran provided a "spectrometer tracking #" to KHAN ending in 5978. KHAN forwarded the tracking number to Co-conspirator #1.

33.     The 5978 shipment was sent on or about January 3, 2013, from New Haven, Connecticut to Islamabad, Pakistan. The shipment purported to originate from "Kauser .Enterprises, USA LLC at 209 Shelton Avenue in New Haven, Connecticut," and was purportedly addressed to "M/S Kauser Enterprises," but the destination address was the address provided by Co-conspirator #1 for Nano Tech Solutions, that is, H. No. 269-B, Street No. 17, F-10/2, Islamabad, Pakistan. The customs declaration form identified the sender as Muhammad Ismail and falsely identified the contents of the package as a portable vacuum, a surge protector, and other accessories with a total value of approximately $470.

34.     On or about January 11, 2013, KHAN sent an email message to Co-conspirator #1 with an attachment that was needed in order for the shipment to be delivered. Specifically, the attachment, on the letterhead of Kauser Enterprises, stated that the 5978 shipment in the name of "(M/S Kauser Enterprises H. No. 269-B, Street No. 17, F-10/2, Islamabad, Pakistan)" actually belongs to "Directorate of Technical Equipment" in Islamabad, which was "authorized" to receive the shipment on behalf of Kauser and clear it through customs. The Directorate of Technical Equipment is a subdivision of PAEC, an organization listed on the DOC Entity List. According to a U.S. Department of Commerce, Bureau of Industry and Security, License Determination, a license was required to export a spectrometer to PAEC.

B.     The January 2013 Bagging Film purchase from Company #2

35.     On or about January 2, 2013, Co-conspirator #1, via email, sent KHAN an RFQ for Capran 980 Bagging Film. KHAN forwarded the request to ISMAIL and Imran.

36.     On or about January 3, 2013, KHAN sent an email to ISMAIL with the subject header "Bagging Film." The body of the email stated, "The End user needs it urgently and can go for SPOT Purchase too. So please quote urgently. This item is to be airlifted to Karachi." Also included in the email was the spreadsheet containing technical specifications of the Bagging Film.

37.     Capran 980 Bagging Film is a clear (low haze level) heat stabilized cast film produced from modified nylon 6 resin. It is recommended as bagging film for advanced composite fabrication and other high temperature applications where dimensional stability, adherence to sealant tapes and uniform film gage are essential. Capran 980 Bagging Film has both commercial and military applications.

38.     On or about January 4, 2013, Imran sent an RFQ on the Bagging Film to Company #2, known to the grand jury. Between January 7-8, 2013, Imran and a representative from Company #2 discussed a price for two 100-pound rolls of Bagging Film. On or about January 11, 2013, KHAN emailed Co-conspirator #1 stating that the price for one 100-pound roll of Bagging Film would be $1204.

39.     On or about January 16, 2013, KHAN emailed Imran stating "Buy this see attached data sheet . . . [description omitted] Need 2 Roll."

40.     On or about January 25, 2013, Imran placed an order with Company #2 for two rolls of Capran 980 Bagging Film for $1,808. In the distributor's "Sold to" and "Ship to" sections on the order confirmation was the address: Brush Locker Tools Division, USA LLC., ********, North Haven, CT 06473.

41.     On or about February 15, 2013, a charge of $1,808 appeared on Imran's American Express Business Platinum Card from Company #2.

42.    Between on or about February 5-13, 2013, Imran arranged for the pick-up of the Bagging Film in Santa Fe Springs, CA and delivery to Pakistan via UPS Freight Forwarding.

43.    On or about February 20, 2013, KHAN sent an email message to Co-conspirator #1 with an attachment that was needed in order for the shipment to be delivered. Specifically, the attachment, on the letterhead of Kauser Enterprises, stated that the shipment ending in 0918 "IN THE NAME OF (M/S KAUSER ENTERPRISES . . .) ACTUALLY BELONGS TO Pakistan Space & Upper Atmospheric Research Commission (SUPARCO)" in Karachi, which was "authorized" to receive the shipment.

44.    On or about February 22, 2013, Co-conspirator #1 emailed KHAN and stated, "I am sending you our covering letter for the bagging film to be submitted at HQ SUPARCO on Monday morning at 9:00am along with your original letter head authority."

45.    On February 25, 2013, Co-conspirator #1 emailed KHAN stating, "…please check the format of 2 pages, page #2 & page #3 and submit it urgently by today." Attached to the email (page 2) was a letter, on letterhead from SUPARCO, stating:

TO WHOM IT MAY CONCERN

> 1. It is certified that goods received against Tracking No. 3027480918 were imported by us on behalf of the National Development Centre [NDC], Islamabad.

According to the Nuclear Threat Initiative, the NDC, also known as the National Development Complex, is the focal point for Pakistan's missile development program and is credited for the redesign of several models, including the Ghaznavi and Shaheen I and II medium range ballistic missile originally developed by SUPARCO and PAEC. NDC is on the Entity List.

46.    On or about February 25, 2013, KHAN emailed a SUPARCO representative, and copied Co-conspirator #1, requesting payment for the bagging film. Attached to the email was

11

an invoice from Brush Locker Tools Division, 209 Shelton Avenue, New Haven, CT for $2,408, signed by Imran.

C. The February 2013 Purchase of Hybrid Couplers from Company #3

47.     On February 22, 2013, Co-conspirator #1 sent KHAN an RFQ for two items, including twelve hybrid couplers. KHAN forwarded the descriptions of the requested items to ISMAIL and Imran.

48.     From on or about February 25, 2013, through on or about April 22, 2013, ISMAIL and Imran sent RFQs for the hybrid couplers to various vendors.

49.     On or about February 28, 2013, a vendor located in Wyoming responded to ISMAIL, declining to sell the hybrid couplers because "[w]e cannot export these."

50.     A hybrid coupler is a passive device used in radio and telecommunications. It is a type of directional coupler where the input power is equally divided between two output ports. Hybrid couplers have both commercial and military applications.

51.     On or about March 13, 2013, KHAN sent an email message to ISMAIL, containing an attachment named "Supply order Suparco." The attachment consists of an order for the same two items identified by Co-conspirator #1, including the hybrid couplers, on the letterhead of the Pakistan Space and Upper Atmosphere Research Commission (SUPARCO).

52.     On or about March 14, 2013, a distributor located in Massachusetts responded to ISMAIL, quoting the hybrid couplers at $1,722 each, for a total of $18,942 for 11 hybrid couplers. The distributor also copied its response to the manufacturer of the hybrid couplers, Company #3, known to the grand jury.

53.     On or about April 12, 2013, ISMAIL forwarded the distributor's quote to Imran. On April 30, 2013, Imran placed an order through the distributor for 10 hybrid couplers,

12

providing a shipping and billing address for "Brush Locker Tools Division" at *** in North Haven, Connecticut.

54.     On or about April 30, 2013, the distributor inquired if the couplers were being exported. Imran falsely responded "no."

55.     On May 1, 2013, the manufacturer sent the following email message to Imran, in pertinent part:

> As we discussed, I have reason to believe that these parts might be ultimately exported out of the US, due to the fact that I had several fairly recent inquiries for the same part, in the same quantity. Can you please go back to your end user (your customer in the US as you indicated) and reiterate to them that [the manufacturer] is required to document any exports of our products with the country of ultimate destination, in order to comply with export regulations. This assurance from you and your customer is quite important.

56.     On or about May 1, 2013, Imran responded: "I don't want you and me to get into any kind of trouble. Give me few days will confirm and get you the answer." On or about May 6, 2013, Imran sent an email message to the manufacturer, falsely representing: "It is going to stay in USA." Imran also raised the quantity of the order to 11 couplers.

57.     On or about June 4, 2013, Company #3 sent an email message to Imran, requesting that Imran "sign and return" an attached purchase order dated May 13, 2013. The "Bill To" portion of the order read: "North Haven Tools, *******, North Haven, CT 06473." The "Ship To" portion of the order read: "Brush Locker Tools Division, 209 Shelton Avenue, New Haven, CT 06511." The purchase order stated, in pertinent part:

> These items are sold strictly for use in the USA. If these items are to be exported from the United States, the party shown as the "Bill to" party on this document is responsible to determine that all applicable U.S. laws and regulations are followed.

58.     On or about June 4, 2013, Imran forwarded the purchase order to KHAN.

According to records provided by Company #3, on or about September 27, 2013, it shipped 10 units, and on or about October 15, 2013, shipped 1 unit. The hybrid couplers were shipped to 209 Shelton Avenue, New Haven, Connecticut (Cerda Market).

59.     On or about October 29, 2013, Imran sent an email to KHAN with no subject header. The body of the email was a snapshot from DHL Express Shipments indicating a shipment on or about October 28, 2013, from the sorting facility, New York City Gateway (origin service area Norwalk, CT) to Karachi, Pakistan, waybill # 3572319741. The DHL label reveals the shipment originated from Brush Locker Tools Division, North Haven, CT to Karachi, Pakistan. The shipment weighed one pound and the description was "cable connector and flash light."

60.     On or about November 5, 2013, KHAN sent an email to Co-conspirator #1 with the subject heading label "Tracking # for VAL-KD-0115 & VAL-KD-0285." The email content read: "Dear Sir, [Company #3] 4336 [coupler model] & Cengong Course tech book dispatch by TCS. Tracking # 306012290147." On or about the same day, KHAN sent an email to Co-conspirator #1, with the subject header of "[company #3] tcs tracking." The body of the email appeared to be a screen shot of shipping detail from TCS. TCS is a courier service started in 1983 with a strong presence in Pakistan and the Middle East. The tracking number, 306012290147, indicated that on or about November 4, 2013, the shipment was picked up at the TCS facility in Karachi and was delivered on or about November 5, 2013, to Rawalpindi, Pakistan. The shipper was shown to be Kauser Enterprises and the Consignee was Value Addition PVT.

61. On or about November 7, 2013, KHAN sent an email to Co-conspirator #1 with the Subject heading "[company #3 detail." The body of the email stated: $1940 * 11= $21340. Shipping with insurance =$600, Duty = $1050.

62. On or about January 21, 2014, Imran sent an email to ISMAIL with the subject heading of, "test result." The body of the email stated, "I have attached both packlists associated with this order. Note Certificate of Compliance on the bottom right." Attached to the email was a PDF file from Company #3, Shipping Department (shipping receipt). The receipt indicated that on or about September 27, 2013, Company #3 sent Imran Khan of Brush Locker Tools Division ten (10) Hybrid Coupler Assemblies, Model 4336, S/N 01844-53.

63. A second shipping receipt indicates that on or about October 15, 2013, the remaining one (1) Coupler Assembly. S/N 01854 was shipped for a total of eleven (11). On both receipts was the following language:

> The above commodity/technical data must be or is being exported from the United States in accordance with Export Administration regulations. Diversion contrary to U.S. law is prohibited. In accordance with U.S. law (Title 15 CFR part 746 and Supplement No.1 to part 774; and Title 31 CFR), resale/re-export or transfer to certain designated countries or foreign personnel, either in the U.S.A. or abroad, is prohibited without the prior written consent of the U.S. Department of Commerce.

On or about February 26, 2014, KHAN sent an email to Co-conspirator #1 and a second individual with the subject header "Original Certificate." The body of the email stated," Sir, please check attached certificate." This was in reply to the individual's email on February 23, 2014, stating, "Please send me the original certificate for adapter hybrid coupler as discussed." Attached to the email were two PDF's. The PDF attachments were the same Company #3 shipping receipts Imran sent to KHAN; however, Imran's identity, business address, phone, email address etc. was heavily redacted. Such information, which is discernable, indicates the

Hybrid Coupler Assembly receipt was from the first shipment of ten (10) units as information on the PDF shows one (1) unit left on order.

D. The February 2013 Purchase of Aluminum Oxide Crystals from Company #4

64.     On or about February 15, 2013, a representative for NILOP, Islamabad, Pakistan, Erum Mehboob, (who is listed on the Entity List), emailed a representative for Nano Tech Solutions, Islamabad, Pakistan, with attached requests for quotes, NILOP-514 (RFQ), for Ti: $Al_2O_3$ (Titanium doped or "Sapphire Crystals" or "Aluminum Oxide Crystals").

65.     On or about February 20, 2013, the Nano Tech Solutions representative sent the RFQ to Co-conspirator #1, who then forwarded the NILOP-514 RFQ on to KHAN on the same day via email.

66.     On or about February 20, 2013, KHAN sent the same NILOP-514 RFQ to Imran.

67.     On or about February 21, 2013, KHAN sent an email to Imran and ISMAIL with the same RFQ, along with web addresses for two distributors of the crystals.

68.     Titanium crystals or aluminum oxide crystals are crystals used for making ultra-short pulse solid state or wavelength tunable lasers. Titanium crystals have both commercial and military applications.

69.     On or about February 20, 2013, Imran sent the NILOP-514 RFQ to a distributor in Lithuania. Between on or about February 21, 2013 and on or about March 26, 2013, Imran and a representative from the Lithuanian crystal distributor negotiated prices for the NILOP-514 RFQ with delivery to the U.S.

70.     On July 18, 2013, Imran sent an email to ISMAIL with the subject header, "payment paid." The body of the email read:

1) 6/25 paid $9070 for crystal paid with my line of credit will charge 1.5

2) 5/4/15 (actual date written) paid $9471 narda cad will charge 2% every month
3) $3706.83 paid 6/24 to wave line card will charge 1.5%

71.    On or about July 22, 2013, KHAN sent an email to Co-conspirator #1 stating "items ready to ship. Item in USA." Attached to the body of the email was a picture (.jpg) of an invoice from Brush Locker Tools Division. The invoice (#90038) was dated July 22, 2013, and the "Bill to" section was revealed to be National Institute of Laser & Optronics (NILOP), Islamabad, Pakistan. The invoice indicated to send payment to Brush Locker Tools Division, 209 Shelton Ave., New Haven, CT (Cerda Market). The description of the items in the invoice was shown to be the $Al_2O_3$ crystals in various lengths and the total cost of the invoice was $10,696 euros. The invoice bank information was listed as: Brush Locker Tools Division, 209 Shelton Ave., New Haven, CT. The bottom of the invoice was signed "Imran" in script.

72.    Between on or about July 24, 2013, and September 2, 2013, Co-conspirator #1 exchanged emails with representatives from Sanco Middle East (Sanco), Sharjah, UAE. According to Sanco's website, "Sanco Middle East provides innovative and leading edge technology and advanced instrumentation for industry, research and educational institutions across the Middle East, Asia and Africa." The emails pertained to Co-conspirator #1 arranging payment to Imran/Brush Locker Tools Division for the $Al_2O_3$ crystals.

73.    On or about September 11, 2013, Imran sent an email to KHAN. The subject of the email read, "urgent crystals." The body of the email stated:

> Crystals are ready for shipping. Payment received is $13,264. It should be between $13,705 and $13,666. There is $400 missing in the exchange rate. My bank only charges $20 for wire fee. If there is a discrepancy with the exchange rate it should not be more than $50. Please check where is the remaining amount.

74.    On or about October 8, 2013, KHAN sent an email to Imran with the

subject "Urgent dispatch today order." The body of the email read, "please send crystal today, Kauser Enterprises, House No. 269, Street No.17, Sector F-10/2, Islamabad, Cell #0333-2294824." On the same day, Imran replied to KHAN stating, "Did you receive the oxygen sensor yet. As soon as you receive it I will dispatch the crystals."

75. On or about October 10, 2013, KHAN emailed Co-conspirator #1 with the subject header of, "Crystal Shipping." The body of the email read, "please see DHL tracking info." Attached to the email was a ".tif" file revealing a DHL Express Worldwide shipping label. The shipper indicated the package was from Brush Locker Tools Division, I. Khan, Phone: 970-380-0162, ******, North Haven, CT 06473. The "To" address was revealed to be: Kauser Enterprises, House No. 269, Street No.17, Sector F-10/2, Islamabad, Pakistan.100.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Export Without a License)
### (Aiding and Abetting)

77. Paragraphs 1 through 7 are hereby re-alleged as if fully set forth herein.

78. On or about January 3, 2013, in the District of Connecticut and elsewhere, the defendants, KAMRAN KHAN, MUHAMMED ISMAIL, BRUSH LOCKER TOOLS DIVISION, KAUSER ENTERPRISES – USA, KAUSER ENTERPRISES, and others known and unknown, willfully exported and caused to be exported from the United States to Pakistan, specifically to the Pakistan Atomic Energy Commission, in Pakistan, an organization listed in the United States Department of Commerce Entity List, which is found at Title 15, Code of Federal Regulations, Part 744, Supplement No. 4, an Alpha Duo Spectrometer, Export Control Classification Number 3A999.b, without having first obtained the required licenses from the United States Department of Commerce.

All in violation of Title 50, United States Code, Sections 1702 and 1705, 15 C.F.R. §

764.2 and Title 18, United States Code, Section 2.

COUNT THREE
(Export Without a License)
(Aiding and Abetting)

79.     Paragraphs 1 through 7 are hereby re-alleged as if fully set forth herein.

80.     On or about February 20, 2013, in the District of Connecticut and elsewhere, the

defendants, KAMRAN KHAN, MUHAMMED ISMAIL, BRUSH LOCKER TOOLS

DIVISION, KAUSER ENTERPRISES, and others known and unknown, willfully exported and

caused to be exported from the United States to Pakistan, specifically to the Space & Upper

Atmosphere Research Commission, in Pakistan, an organization listed in the United States

Department of Commerce Entity List, which is found at Title 15, Code of Federal Regulations,

Part 744, Supplement No. 4, Capran 980 Bagging Film, classified as EAR 99, without having

first obtained the required licenses from the United States Department of Commerce.

All in violation of Title 50, United States Code, Sections 1702 and 1705, 15 C.F.R. §

764.2 and Title 18, United States Code, Section 2.

COUNT FOUR
(Export Without a License)
(Aiding and Abetting)

81.     Paragraphs 1 through 7 are hereby re-alleged as if fully set forth herein.

82.     On or about October 28, 2013, in the District of Connecticut and elsewhere, the

defendants, KAMRAN KHAN, MUHAMMED ISMAIL, BRUSH LOCKER TOOLS

DIVISION, NORTH HAVEN TOOLS, KAUSER ENTERPRISES, and others known and

unknown, willfully exported and caused to be exported from the United States to Pakistan,

specifically to the Space & Upper Atmosphere Research Commission, in Pakistan, an

19

organization listed in the United States Department of Commerce Entity List, which is found at

Title 15, Code of Federal Regulations, Part 744, Supplement No. 4, hybrid couplers, classified as

EAR 99, without having first obtained the required licenses from the United States Department

of Commerce.

All in violation of Title 50, United States Code, Sections 1702 and 1705, 15 C.F.R. §

764.2 and Title 18, United States Code, Section 2.

COUNT FIVE
(Export Without a License)
(Aiding and Abetting)

83.    Paragraphs 1 through 7 are hereby re-alleged as if fully set forth herein.

84.    On or about October 10, 2013, in the District of Connecticut and elsewhere, the

defendants, KAMRAN KHAN, MUHAMMED ISMAIL, BRUSH LOCKER TOOLS

DIVISION, KAUSER ENTERPRISES, and others known and unknown, willfully exported and

caused to be exported from the United States to Pakistan, specifically to the National Institute of

Lasers & Optronics, in Pakistan, an organization listed in the United States Department of

Commerce Entity List, which is found at Title 15, Code of Federal Regulations, Part 744,

Supplement No. 4, aluminum oxide crystals, classified as EAR 99, without having first obtained

the required licenses from the United States Department of Commerce.

All in violation of Title 50, United States Code, Sections 1702 and 1705, 15 C.F.R. §

764.2 and Title 18, United States Code, Section 2.

COUNT SIX
(Conspiracy to Launder Monetary Instruments)

85.    From a date unknown, but no later than August 12, 2012, continuing to on or

about October 10, 2013, in the District of Connecticut and elsewhere, KAMRAN KHAN,

MUHAMMED ISMAIL, BRUSH LOCKER TOOLS DIVISION, NORTH HAVEN TOOLS,

KAUSER ENTERPRISES – USA and KAUSER ENTERPRISES, did knowingly combine, conspire, and agree with each other, and with other persons known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, specifically: to transmit and transfer and attempt to transmit and transfer monetary instruments and funds from a place outside the United States to and through a place inside the United States with the intent to promote the carrying on of a specified unlawful activity, that is, the export of controlled items without a license as prohibited by IEEPA, 50 U.S.C. Section 1705(c), in violation of Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Section 1956(h).

### COUNT SEVEN
(International Laundering of Monetary Instruments)
(Aiding and Abetting)

86. On or about December 12, 2012, in the District of Connecticut and elsewhere, KAMRAN KHAN, KAUSER ENTERPRISES – USA and KAUSER ENTERPRISES, the defendants herein, did transmit, transfer and attempt to transmit and transfer, monetary instruments, that is, $35,549.66, from a place outside the United States, that is Pakistan, to a place in the United States, that is, Connecticut, with the intent to promote the carrying on of a specified unlawful activity, that is, the export of controlled items without a license in violation of IEEPA, 50 U.S.C. Section 1705(c).

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

21

## COUNT EIGHT
(International Laundering of Monetary Instruments)
(Aiding and Abetting)

87.     On or about August 30, 2013, in the District of Connecticut and elsewhere,

KAMRAN KHAN, KAUSER ENTERPRISES – USA and KAUSER ENTERPRISES, the

defendants herein, did transmit, transfer and attempt to transmit and transfer, monetary

instruments, that is, $13,264, from a place outside the United States, that is Pakistan, to a place in

the United States, that is, Connecticut, with the intent to promote the carrying on of a specified

unlawful activity, that is, the export of controlled items without a

license in violation of IEEPA, 50 U.S.C. Section 1705(c).

     All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## COUNT NINE
(False Statement)

88.     On or about January 3, 2013, in the District of Connecticut and elsewhere,

MUHAMMED ISMAIL, the defendant herein, did, willfully and knowingly, make a false

writing and document, knowing the same to contain a materially false, fictitious, and fraudulent

statement and entry in a matter within the jurisdiction of the executive branch of the Government

of the United States, that is, he subscribed a Customs Declaration and Dispatch Note, No.

CW266884775US, regarding a package being shipped to Kauser Enterprises, H. No 269-B,

Street No. 17 F10/2, Islamabad, Pakistan, which certified that the particulars given were correct,

including that the packaged contained (1) Portable vacuum with a value of $100; (1) power surge

protector with a value of $300; (2) electrical cords with a value of $20; and a plastic hose valued

at $50; when in fact the package contained an Alpha Duo Spectrometer, an export controlled item with a value $7,920.

All in violation of Title 18, United States Code, Section 1001.

A TRUE BILL

_____
FOREPERSON

UNITED STATES OF AMERICA

_____
DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____
JACABED RODRIGUEZ-COSS
ASSISTANT U.S. ATTORNEY